IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff-Respondent, | § | |
| | § | |
| V. | § | CRIMINAL ACTION NO. H-06-89-1 |
| | § | CIVIL ACTION NO. H-09-313 |
| BONIFACIO HERNANDEZ | § | |
| | § | |
| | § | |
| Defendant-Movant. | § | |

**<u>MEMORANDUM AND RECOMMENDATION</u>**

Before the Magistrate Judge in this federal habeas corpus proceeding pursuant to 28 U.S.C.

§ 2255 is Movant Bonifacio Hernandez's § 2255 Motion to Vacate, Set Aside or Correct Sentence

(Document No.427),[1] the United States' Answer and Motion to Dismiss (Document Nos. 435 and

436), Movant's Reply Brief in Opposition to the United States' Response and Motion to Dismiss

(Document No. 439), and Movant's Motion for an Evidentiary Hearing (Document No. 440). After

reviewing the parties' submissions, the record of the proceedings before the District Court in the

underlying criminal case, and the applicable case law, the Magistrate Judge RECOMMENDS, for the

reasons set forth below, that the Government's  Motion To Dismiss (Document No. 436) be

GRANTED, that Movant's § 2255 Motion to Vacate, Set Aside, or Correct Sentence (Document

---

[1]Bonifacio Hernandez's  Motion to Vacate, Set Aside or Correct Sentence can be found at
Document No. 1 in Civil Action H-09-313 and at Document No. 427 in Criminal Action No. H-06-
89.  References hereafter will be to the Criminal Document numbers unless otherwise indicated.

No. 427) be DENIED and that this § 2255 proceeding be DISMISSED.  The Magistrate Judge

further ORDERS that Movant's Motion for an Evidentiary Hearing (Document No. 440) is DENIED.

## I.    Procedural History

Movant  Bonifacio Hernandez ("Hernandez") who is currently in the custody of the United

States Bureau of Prisons, is seeking federal habeas corpus relief under 28 U.S.C. § 2255.  This is

Hernandez's first attempt at § 2255 relief.

On March 21, 2006, Hernandez, along with Juan A. Escobar, Leon Baldomero DeLeon,

Sugentino Percel, Eric Vasquez, Leonardo Arcemio Garcia, Jesus Alejandro Osorio, and German

Arias, was charged by Indictment with drug trafficking activities.  In particular, Hernandez was

charged with conspiracy to possess with intent to distribute 5 kilograms or more of cocaine in

violation of 21 U.S.C. §§ 846, 841(a)(1) & 841(b)(1)(A)(ii) (Count one), and possession with intent

to distribute 5 kilograms or more of cocaine in violation of 21 U.S.C. §§ 841(a)(1) & 841(b)(1)(A)(ii),

and 18 U.S.C. § 2 (Count two).  (Document No. 22).  On June 20, 2006, Hernandez pleaded guilty

to Counts One and Two.  (Document No. 104, Transcript of Rearraignment, Document No. 353).

 No written Plea Agreement was entered.  However, the parties submitted a Factual Basis in support

of Hernandez's guilty plea.  (Document No. 107).  The Factual Basis states in pertinent part:

> Beginning on or about 20 February 2006 and continuing up to about 21 February
> 2006, **Bonifacio Hernandez**, in the Houston Division of the Southern District of
> Texas, did unlawfully, knowingly, and intentionally, combine, conspire, confederate,
> and agree with Juan Antonio Escobar, Leon Baldomero Deleon, Sugentino Percel,
> Eric Vasquez, Leonardo Arcemio Garcia, Jesus Alejandro Osorio, German Arias
> ("codefendants"), and others, known and unknown, to possess with the intent to
> distribute cocaine, a Schedule II controlled substance, in an amount greater than 5
> kilograms.  In addition, on or about 21 February 2006, **Bonifacio Hernandez**, aiding,
> assisting, and abetting his codefendants and others known and unknown, did

unlawfully, knowingly, and intentionally possess with the intent to distribute cocaine, a Schedule II controlled substance, in an amount greater than 5 kilograms a (sic) controlled substance. Specifically, defendant admits to conspiring to possess with the intent to distribute as well as aiding and abetting the possession of at least 15 kilograms but less than 50 kilograms of cocaine.

On or about 21 February 2006, **Hernandez**, Escobar, and Deleon met inside the Bravos restaurant at the corner of Bingle and Northwest Freeway in Houston, Texas to discuss an impending cocaine deal. After meeting, [Escobar] and Deleon left in a 1999 (TX tag F36DBH) gray Jeep Cherokee. The Explorer went to 7430 Weatherhill, Houston, TX, where Escobar and Deleon got out and entered the residence.

At approximately 5:00 p.m., Escobar and Deleon walked from the Weatherhill residence carrying a black canvas bag (containing an electronic money counter) and two black plastic trash bags (containing cocaine). Garcia was to wait at the Weatherhill residence until Escobar and Deleon collected cocaine proceeds for transport to Mexico. Escobar and Deleon were to put money in the Dodge's hidden compartment for Garcia to transport back to Mexico.

Escobar and Deleon drove from the Weatherhill residence to 8915 Alejo, Houston, TX. where the black canvas bag and the two black plastic bags were carried inside. Escobar then drove back to the Bravos restaurant.

At the restaurant, **Hernandez**, Percel, and Vasquez got into the Explorer and were driven by Escobar to the Alejo residence. Escobar then drove to 3737 Watonga, Houston, TX, where he picked up Osorio and Arias and drove them back to the Alejo residence. Shortly thereafter, Escobar, Osorio, and Vasquez went back to 3737 Watonga where Osorio and Vasquez picked up a 2005 gray (IL tag D264919) minivan and returned back to the Alejo residence, where the minivan went into the attached garage and the Explorer then parked in the driveway.

While at the residence, Percel, Vasquez and Arias packaged kilogram-sized bricks of cocaine into seal (sic) bags, loading 10 of the bricks into a hidden compartment in the minivan. Escobar, **Hernandez**, Deleon, and Osorio, all, at times, were in the kitchen/dining room area where the cocaine was being packaged.

About two hours later, at approximately 11:10 p.m., Escobar left the Alejo residence, got in the Explorer and pulled out of the driveway. At about the same time, the garage door opened and the minivan pulled out.

Shortly after departing from the Alejo residence, the minivan was stopped by Harris County Deputies on Bingle Road. Inside the minivan was Arias, who was driving,

and Osorio, who was in the front passenger seat. During the subsequent search, officers located 10 kilogram-sized bricks of suspected cocaine from the right rear quarter panel of the minivan where the narcotics dog had alerted. Lab testing confirmed that the substance recovered was **cocaine** with a net weight of **9.89 kilograms**. These bricks were wrapped in green cellophane and heat sealed in a bag and had axle grease on them. While this traffic stop was occurring, the Explorer did a U-turn, drove past the stopped minivan, and drove off in the direction of the Alejo residence.

Just as the Explorer was driving down the street of the Alejo residence, the front door opened and Deleon, Percel, **Hernandez**, and Vasquez left the residence, quickly went down the street, and got into the Explorer. The Explorer then drove exceedingly fast through the neighborhood.

The Explorer was followed back to the 3737 Watonga, where it was stopped by the Houston Police Department. Escobar, Deleon, Percel, **Hernandez**, and Vasquez were all inside the Explorer.

Escobar had called **Hernandez** and advised him of the traffic stop on the minivan. Escobar told **Hernandez** to get out of the Alejo residence and that he (Escobar) would pick them up. After Escobar picked up Deleon, **Hernandez**, Vasquez and Percel, they all discussed what they were going to do and where they would go to avoid law enforcement.

At the Alejo residence officers found 25 kilogram-sized bricks of suspected cocaine from the front bedroom. Lab testing confirmed that the substance recovered was **cocaine** with a net weight of **24.9 kilograms**. These bricks were identical to the 10 bricks of cocaine seized from the minivan in size, shape and wrapping. In addition, an electronic money counter was found inside a black canvas bag. Other items recovered: green cellophane from the kitchen/dining room area, heat sealing bags, axle grease, latex gloves (both used and unused), a heat sealing machine, heating sealing bags, paper towel with axle grease, and wrench and screwdriver sets.

At the Weatherhill residence, where Garcia was still present, officers found 8 kilograms-sized bricks of suspected cocaine from the master bedroom closet. Lab testing confirmed that the substance recovered was **cocaine** with a net weight of **7.8 kilograms**. Also recovered was approximately $50,000 in U.S. Currency from the master bedroom, green cellophane from the kitchen, a heat sealing machine from the back bedroom, a suspected drug ledger from the master bedroom, two firearms (a Ruger 9mm from the master bedroom and a Gabilondo y Cia Vitoria .45 front the front bedroom) an electronic scale from the kitchen area, and Garcia's 1997 Dodge pickup (Texas tag 96KVZ2) which had a hidden compartment built between the backseat and the payload. (Document No. 107) (emphasis in original).

4

At Hernandez's June 30, 2006, Rearraignment hearing, the Court engaged in an extended colloquy to ensure that Hernandez understood the charges against him, including the elements of the offense, the maximum penalties, the rights he was waiving, the factual basis of the plea, and the manner in which his sentence would be calculated. (Document No. 104, Transcript of Rearraignment Hearing, Document No. 353). In particular, with respect to Hernandez's understanding of the elements of the offense, the rights he was waiving, and the calculation of Hernandez's sentence, the following exchanges took place between Hernandez and the Court regarding Hernandez's understanding of his plea:

> The Court: All right. Mr. Hernandez, has anybody made any promises or assurances to you of any kind in an effort to persuade you to plead guilty in this case?
>
> Defendant Hernandez: No.
>
> The Court: Has anybody in any way attempted to force you to plead guilty in this case?
>
> Defendant Hernandez: No. No, your Honor.
>
>           *                 *
>
> The Court: And do you understand that if your plea is accepted by the Court, you will be found guilty of those offenses and such adjudication may deprive you of valuable civil rights, such [as] the right to vote, the right to hold public office, the right to serve on a jury, and the right to possess firearms? Do you understand all that, Mr. Hernandez?
>
> Defendant Hernandez? Yes, I understand.
>
>           *                 *
>
> The Court: All right. Do each of you understand that under the Sentencing Reform Act of 1984, the United States Sentencing Commission has issued guidelines for

judges to follow to determine what the sentence will be in a criminal case?  Do you understand that, Mr. Hernandez?

Defendant Hernandez:  Yes, I understand.

                *                             *

The Court:  Have each of you discussed with your attorney how those sentencing guidelines may apply in your case?  Mr. Hernandez, have you discussed the guidelines with Mr. Adler?

Defendant Hernandez:  Yes.

                *                             *

The Court:  All right.  Do each of you understand that the sentencing guidelines are no longer mandatory but are advisory?  Mr. Hernandez?

Defendant Hernandez:  Yes, I understand.

                *                             *

The Court:  But I am obliged to consider the guidelines when I determine what your sentence will be.  Do you understand that, Mr. Hernandez?

Defendant Hernandez:  Yes, I understand.

                *                             *

The Court:  All right.  And that means that a probation officer will be ordered to conduct an investigation of your case and to write a presentence report that will assist me in sentencing.  Do you understand that, Mr. Hernandez?

Defendant Hernandez:  Yes, I understand.

                *                             *

The Court:  All right.  And for that reason I will not be able to tell you what your sentence is today.  Do you understand that, Mr. Hernandez?

Defendant Hernandez:  Yes, I understand.

                *                             *

The Court:  All right.  Once the probation officer has written the presentence report, you and your attorney will get a copy of that report and the government will also get a copy of that report.  And each of you will be given an opportunity to make objections to that presentence report.  We will then have a sentencing hearing.  At that hearing I will rule on any objections that may be made to the presentence report. I will also rule on any motions that may be made, any recommendations that may be made, or any other matters that might be brought to my attention that might have an impact on the kind of sentence that you receive.  Do you understand that, Mr. Hernandez?

Defendant Hernandez:  Yes, I understand.

                              *                                              *

The Court:  And at the conclusion of that sentencing hearing, I will then be in a position to determine what your sentence will be.  And when I pronounce sentence, it may be that the sentence I give you is more severe than the one that you and your attorney may have estimated you might get when you were discussing how the guidelines might apply in your case.  Do you understand that, Mr. Hernandez?

Defendant Hernandez:  Yes, I understand.

                              *                                              *

The Court:  And if you receive a sentence that is more severe than the one you're expecting, do each of you understand that you will not be given an opportunity to withdraw your plea of guilty?  Do you understand that, Mr. Hernandez?

Defendant Hernandez:  Yes, I understand.

                              *                                              *

The Court:  All right.  Do each of you also understand that — I believe each of these defendants is facing a mandatory minimum; is that correct?

Mr. Mason:  Yes, your Honor.

The Court:  Do each of you understand that the guidelines are trumped by statutes that require the Court to give mandatory minimum sentences in some cases, particularly in drug related cases?  Do you understand that, Mr. Hernandez?

Defendant Hernandez:  Yes, I understand.

                                              7

                    *                                    *

The Court:  All right.  And because each of your cases would be subject to those mandatory minimums, no matter what the guidelines might tell me would be a guideline sentence, I would be required to give you at least ten years in prison.  Do you understand that, Mr. Hernandez?

Defendant Hernandez: Yes, I understand.

                    *                                    *

The Court:  All right.  Do each of you understand that you have a right to plead not guilty to any offense charged against you?  Mr. Hernandez?

Defendant Hernandez:  Si.

                    *                                    *

Defendant Hernandez:  I mean, I'm guilty.

The Court:  I know, but I'm asking you – you've got to listen to my question now.  My question is this:  Do you understand that you have a right to plead not guilty to any offense charged against you?

Defendant Hernandez:  Would you explain it?

The Court: Yes.  You are accused of a crime and you can say to me, "I am guilty of the crime" or "I'm not guilty of the crime."  And I just want you to know you — I mean, I just want to be sure that you know you don't have to plead guilty.  And you could plead not guilty.  You have a right to plead not guilty if you choose to do so.  Do you understand that?

Defendant Hernandez:  Yes, I understand.

                    *                                    *

The Court:  All right.  And do each of you understand that if you persisted in a plea of not guilty, if you continued to say, "I'm not guilty," that you would have the right to a trial by jury or by judge?  Do you understand, Mr. Hernandez?

Defendant Hernandez:  Yes, I understand.

                    *                                    *

The Court: All right. And do each of you understand that at that trial, if you decided to go to trial, you would have the right to the representation of counsel in your defense? Do you understand that, Mr. Hernandez?

Defendant Hernandez: Yes, I understand.

                    *                                  *

The Court: You would have the right to see and hear all the witnesses and have them cross-examined in your defense, you would have the right on your own part to decline to testify unless you voluntarily elected to do so in your own defense, and you would have the right to issuance of subpoenas, compulsory process to compel the attendance of witnesses to testify in your defense. Do you understand all that, Mr. Hernandez?

Defendant Hernandez: Yes, I understand.

                    *                                  *

The Court: All right. Do each of you also understand that if we had a trial, the jury would be told that you had a right not to testify or put on any evidence and they would be told that if you decided not to put on any evidence or testify at your trial, that they, the jury, could not hold that against you as some indication or evidence that you were guilty? Do you understand that, Mr. Hernandez?

Defendant Hernandez: Yes, I understand.

                    *                                  *

The Court: All right. And do you further understand that at the trial the jury would be told that they could not expect you to testify? They couldn't expect you to explain yourself. They couldn't expect you to put on any evidence or to prove your own innocence. Mr. Hernandez, do you understand that?

Defendant Hernandez: Yes, I understand.

                    *                                  *

The Court: Do each of you further understand that by entering a plea of guilty, if that plea is accepted by the Court, that there will be no trial and you will have waived or given up your right to a trial as well as all the other rights associated with a trial that I've just outlined for you? Do you understand that, Mr. Hernandez?

Defendant Hernandez: Yes, I understand.

              \*                            \*

The Court: All right. I want to go over with each of you the essential elements of the crimes you're pleading guilty to. Now, by "essential elements" I mean what it is the government would have to prove to a jury beyond a reasonable doubt before that jury could find you guilty.

All right. The essential elements of Count 1, which each of you is pleading guilty to Count 1, and the essential elements of that count are as follows:

And Count 1 charges each of you with conspiracy to possess with the intent to distribute cocaine, which is a violation of 21, United States Code, Sections 841(a)(1), 841(b)(1)(A)(ii), 846.

The elements are: One, that two or more persons, directly or indirectly, reached an agreement to possess with the intent to distribute cocaine; second, that the defendant, that is you, Mr. Hernandez, you, Mr. Arias, knew of the unlawful purpose of the agreement, that the defendant joined in the agreement willfully, that is, with the intent to further its unlawful purpose; and, four, that the overall scope of the conspiracy involved at least 5 kilograms of cocaine.

Mr. Hernandez, do you understand–

Defendant Hernandez: Yes, yes.

The Court: Wait a minute. Let me finish now. Do you understand that those are the essential elements of Count 1 that you are pleading guilty to this morning?

Defendant Hernandez: Yes.

              \*                            \*

The Court: All right. Now, Count 2 charges Mr. Hernandez with aiding and abetting in the possession with the intent to distribute, which is a violation of 21, United States Code, Section 841(a)(1) and (b)(1)(A)(ii) and 18, United States Code, Section 2.

Now, Mr. Hernandez, the elements of that offense are: First, that the defendant, that's you, Mr. Hernandez, knowingly possessed a control substance; second, that the substance was in fact cocaine; third, that you possessed the substance with the intent to distribute it; and fourth, that the quantity of the substance was at least 5 kilograms.

Now, you're charged with aiding and abetting, and by that I take it that you may not have actually possessed or controlled the substance, but you may have helped

someone else to possess and control the substance.  So, the essential elements of aiding and abetting, which is a violation of 18, United States Code, Section 2, are that the defendant, you, Mr. Hernandez, associated with a criminal venture and that criminal venture would have been the possession and control of a substance that was in fact cocaine with the intent to distribute it in the quantity of at least 5 kilograms; second, that you participated in that criminal venture; and, third, that you sought by your actions to make that venture succeed.

Do you understand that those are the essential elements of Count 2, aiding and abetting in the possession with the intent to distribute?

Defendant Hernandez:  Yes.

The Court:  All right.  Mr. Mason, tell me what it is the government's prepared to prove if we went to trial in the case against these two defendants.

Mr. Mason:  Yes, Your Honor.  If called upon to do so, the United States would be able to prove beyond a reasonable doubt that beginning on or about the 20th of February 2006 and continuing up to and about the 21st of February 2006, Bonifacio Hernandez and German Arias, in the Houston Division of the Southern District of Texas, did unlawfully, knowingly, and intentionally combine, conspire, confederate, and agree with Juan Antonio Escobar, Leon Boldomero Deleon, Sugentino Percel, Eric Vasquez, Leonardo Arcemio Garcia, and Jesus Alejandro Osorio to possess with the intent to distribute cocaine, a Schedule II controlled substance, in an amount greater than 5 kilograms.

In addition, on or about the 21st of February 2006, Mr. Hernandez, aiding, assisting, and abetting his codefendants, did unlawfully, knowingly, and intentionally possess with the intent to distribute cocaine, in an amount greater than 5 kilograms.

                                        *                                        *

Specifically, on or about the 21st of February 2006, Mr. Hernandez, Escobar, and Deleon met inside the Bravos restaurant at the corner of Bingle and Northwest Freeway in Houston to discuss an impending cocaine deal.

After meeting, Mr. Escobar and Deleon left in a 1993 green Ford Explorer and Mr. Hernandez left in a 1999 gray Jeep Cherokee.  The Explorer went to 7430 Weatherhill in Houston, where Escobar and Deleon got out and entered the residence.

The prior day, Mr. Garcia had transported cocaine from Mexico to this Weatherhill address in a white Dodge pickup with a hidden compartment and parked the Dodge

11

in the garage.  Mr. Escobar and Mr. Deleon took the cocaine out of the hidden compartment and put some in two black plastic trash bags.

Back on the 21st of February at approximately 5:00 p.m., Mr. Escobar and Deleon walked from the Weatherhill residence carrying a black canvas bag containing an electric money counter and two black plastic trash bags which contained cocaine.

Mr. Garcia was to wait at the Weatherhill residence until Mr. Escobar and Deleon collected cocaine proceeds to transport to Mexico.

Mr. Escobar and Deleon were to put money in the Dodge's hidden compartment for Mr. Garcia to transport back to Mexico.

Mr. Escobar and Deleon drove from the Weatherhill residence to 8915 Alejo in Houston where the black canvas bag and the two black plastic bags were carried inside.  Mr. Escobar then drove back to the Bravos restaurant.

At the restaurant, Mr. Hernandez, Percel, and Vasquez got into the Explorer and were driven by Escobar to the Alejo residence.  Mr. Escobar then drove to 3737 Watonga in Houston where he picked up Osorio and Arias and drove them back to the Alejo residence.

Shortly thereafter, Mr. Escobar, Osorio, and Vasquez went back to 3737 Watonga where Osorio and Vasquez picked up a 2005 gray minivan and returned back to the Alejo residence, where the minivan went into the attached garage and the Explorer in the driveway.

While at the residence, Percel, Vasquez, and Arias packaged kilogram-sized brick of cocaine into seal bags—

                      *                             *

While at the residence, Percel, Vasquez, and Arias packaged kilogram-sized bricks of cocaine into seal bags, loading ten of those bricks into a hidden compartment in the minivan.  Mr. Escobar, Hernandez, Deleon, and Osorio all at times were in the kitchen/dining room area where the cocaine was being packaged.

At approximately 11:10 p.m. that day, Mr. Escobar left the Alejo residence, got in the Explorer and pulled out of the driveway.  At about the same time, the garage door opened and the minivan pulled out.

Shortly after departing from the Alejo residence, the minivan was stopped by Harris County deputies on Bingle Road. Inside the minivan was Arias, who was driving, and Osorio, who was the front passenger.

During the subsequent search, officers located ten kilogram-sized bricks of suspected cocaine from the right, rear quarter panel of the minivan where the narcotic dog had alerted.

Lab testing confirmed that the substance recovered was cocaine with a net weight of 9.89 kilograms. These bricks were wrapped in green cellophane and heat sealed in a bag and had axle grease on them.

While this traffic stop was occurring, the Explorer did a U-turn, drove past the stopped minivan and drove off in the direction of the Alejo residence. As the Explorer was driving down the street of the Alejo residence, the front door opened and Deleon, Percel, Hernandez, and Vasquez left the residence, quickly went down the street and got into the Explorer. The Explorer then drove exceedingly fast through the neighborhood.

The Explorer was followed back to 3737 Watonga, where it was stopped by the Houston Police Department. Escobar, Deleon, Percel, Hernandez, Vasquez were also inside the Explorer.

Escobar had called Hernandez and advised him of the traffic stop of the minivan, telling Hernandez to get out of the Alejo residence, and that he, Escobar, would pick them up. After Escobar picked up Deleon, Hernandez, Vasquez, and Percel, they all discussed what was going — what they were going to do and where they would go to avoid law enforcement.

At the Alejo residence officers found 25 kilogram-sized bricks of suspected cocaine from the front bedroom. Lab testing confirmed that the substance was cocaine with a net weight of 24.9 kilograms. These bricks were identical to the ten bricks of cocaine seized from the minivan in size, shape, and wrapping.

In addition, an electronic money counter was found inside a black canvas bag. Other items recovered included green cellophane from the kitchen/dining room area; heat sealing bags; axle grease; latex gloves, both used and unused; a heat sealing machine; paper towel with axle grease; and a wrench and screwdriver sets.

At the Weatherhill residence, where Garcia was still present, officers found 8 kilogram-sized bricks of suspected cocaine from the master bedroom closet. Lab testing confirmed that the substance was cocaine with a new weight of 7.8 kilograms. Also recovered was approximately $50,000 in U.S. currency from the master

bedroom; green cellophane from the kitchen; a heat sealing machine from the back bedroom; a suspected drug leger from the master bedroom; and two firearms, a Ruger 9 millimeter and a .45 caliber from the front bedroom; an electronic scale from the kitchen area; and Garcia's 1997 Dodge pickup, which had a hidden compartment built between the back seat and the payload.

The Court:  Mr. Hernandez, tell me what it is you did — in your own words, what it is you did to commit the crime that you're pleading guilty to this morning.

Defendant Hernandez:  My responsible was to have gone and picked up 10 kilos of cocaine at that house.

The Court:  Pretty much what Mr. Mason just told us?

Defendant Hernandez:  Yes.  Mr. Deleon gave them to me.

The Court:  You don't have any quarrel with what he's saying he could prove at trial if we went to trial?

Defendant Hernandez:  No, I don't want to go to trial.

The Court:  No, I know you don't want to go to trial.  All I'm saying is, Mr. Mason just read us a lengthy factual summary of this case and he's telling me that this is what he believes he could prove if we had a trial.  And I just want to know if you have any argument with that, you feel like that he couldn't prove that or that's not what happened.

Defendant Hernandez:  I think that it happened.

The Court:  Okay.

Mr. Adler:  Judge, the only thing I would add is that Mr. Hernandez doesn't know what was going on at the Weatherhill residence.

The Court:  Right.  But I mean as far as you're concerned, that's what happened? I mean, where it talks about you, that's what you did?  When Mr. Mason is talking about what you did— when he just told me what he thinks we can prove you did, you aren't saying you didn't do that?  You did that; is that right?

Defendant Hernandez:  Yes, I did it.  (Transcript of Rearraignment, Document No. 353, p. 8, 12, 15-18, 20-32).

Prior to sentencing, a Pre-sentence Investigation Report ("PSR") was prepared (Document No. 220), to which Hernandez filed written objections. (Document No. 214).[2] The Government responded to Hernandez's objections.[3] (Document No. 216). Pursuant to the PSR, Hernandez's

---

[2] The docket sheet shows that Hernandez filed written objections to the PSR. Hernandez primarily objected to the quantity of cocaine he was held accountable, namely, 34.8 kilograms of cocaine from Deleon, Escobar, and Garcia as described in PSR ¶¶ 36, 43, and 52. According to Hernandez, he should have only been accountable for the 9.9 kilograms of cocaine that was seized from the van driven by Arias. In particular, the objection states:

> Hernandez should be sentenced based upon the 9.9 kilograms seized from the van driven by Arias. The PSR clearly demonstrates that Hernandez was involved only in the transaction for the 9.9 kilograms. The report does not, however, provide a basis for claiming that the entire 34.8 kilograms was foreseeable to Hernandez. The report simply concludes that Hernandez should be held accountable for the entire amount of drugs seized in the case. However, "bald conclusory statements do not acquire the patina of reliability by mere inclusion in the PSR." *U.S. v. Elwood*, 999 F.2d 814, 817-18 (5th Cir. 1993). Hernandez's mere presence at the Alejo residence is not sufficient to show that the additional kilograms were foreseeable to him.

Based on Hernandez's calculation, his base offense level should have been 32, and with a three level reduction for acceptance of responsibility would have resulted in an adjusted offense level of 29, and with a Criminal History Category IV, a sentencing range of 121 to 151 months. (Document No. 214).

[3] The Government responded to Hernandez's PSR objections. With respect to Hernandez's objections to his relevant conduct assessment, offense level calculation and guideline range, the Government wrote:

> **Hernandez** objects to the PSR's determination that he should be held accountable for the 34.8 kilograms Hernandez helped negotiate for sale because only the first portion of this cocaine 9.9 kilograms was actually loaded into a vehicle and initially seized. See Def's Obj., ¶¶ 2-5. The United States believes the PSR properly determined the amount of cocaine accountable to Hernandez.
>
> First, the 34.8 kilograms the PSR holds Hernandez accountable for is what Hernandez's cocaine deal involved. The trial of codefendants Eric Vasquez, Sugentino Percel, and Jesus Osorio proved that Vasquez, Percel, and Arias were purchasing 35 kilograms of cocaine from Baldomero Deleon with Hernandez acting as the broker. The 35 kilograms were brought over to 8915 Alejo, Houston, Texas, where the transaction was to take place, from 7430 Weatherhill in Houston. At the Alejo residence, the 35 kilograms were repackaged. The first portion of this cocaine – 9.9 kilograms– was put into a minivan that was stopped by police where it was discovered in a hidden compartment. The remainder – 24.9 kilograms– was to be

15

sentence was calculated as follows: (1) In calculating Hernandez's base offense level, because Hernandez was held accountable for 34.8 kilograms of cocaine he had a base offense level of 34. (2) Because Hernandez accepted responsibility for his conduct, and did so in a timely manner, pursuant to U.S.S.G. § 3E1.1(a) & (b), his offense level was reduced by three levels. (3) With an adjusted base offense level of 31, and with a criminal history category of VI, Hernandez had a guideline sentencing range of 151 to 188 months. Hernandez was sentenced on March 2, 2007. (Document No.245, Transcript of Sentencing Hearing, Document No. 335). With respect to Hernandez's objections to the PSR based on drug quantity, Hernandez's objections were overruled as follows:

> The Court: Essentially, Mr. Adler – I mean, it's just a variation on the theme here, but the theme that you have presented is you think that Mr. Hernandez should just be held accountable for 9.9 kilograms rather than 34 point whatever kilograms. Right?
>
> Mr. Adler: That's right, your Honor.

---

loaded into a second vehicle after the minivan had been dropped off and the second vehicle was brought to the Alejo residence. This second vehicle contained the payment for the entire 35 kilograms of cocaine. The money would have been unloaded from the second vehicle's hidden compartment and this second portion of cocaine was to be loaded into that compartment. Both the 9.9 kilograms from the minivan, as well as the 24.9 kilograms meant for the second vehicle and recovered from the Alejo residence, were packaged identically. Everything required to repackage cocaine– a heat sealing machine, heat sealing bags, latex gloves, and the old discarded kilo wrappers– were recovered from the Alejo residence. Moreover, a money counter was also recovered, which would have been used to count the payment money in the second vehicle.

Second, the factual basis presented to this Court in support of defendant's guilty plea included an admission by Hernandez to "specifically ... to conspiring to possess with the intent to distribute as well as aiding and abetting the possession of at least 15 kilograms but less than 50 kilograms of cocaine." See Factual Basis (DE #107) at 1 (emphasis added). 34.8 kilograms of cocaine is in this admitted range; 9.9 kilograms is not.

The Court:  Now, you know better than that, don't you?

Mr. Adler:  Know better than ...?

The Court:  To know that the Guidelines provide otherwise.

Mr. Adler:  I understand the Guidelines provide that it has to be foreseeable to the defendant, and the objection is simply that the larger quantity was not foreseeable to him.  I understand the Government has filed a pleading stating that there was testimony at the trial stating otherwise.  Obviously, we were not at that trial.  So, I hope that does not aggravate the Court, but we were not aware of what the trial testimony was---

The Court:  Oh, I am not aggravated in the least, but I just — I mean, after reading the presentence report it seems pretty clear to me that the credible evidence – just putting aside the trial testimony, just the credible evidence from the case file would indicate that it was foreseeable, that the entire amount was foreseeable.  So, I am going to overrule your objection, all these objections.  (Transcript of Sentencing Hearing, Document No. 335, pp. 4-5).

Hernandez was sentenced to a term of imprisonment of 170 months on Counts 1 and 2, to be served

concurrently, to be followed by concurrent terms of supervised release of 5 years.  Also, the Court

imposed a special assessment of $200.  (Document No. 245, Transcript of Sentencing Hearing,

Document No. 335, pp. 8-10).  With the respect to Hernandez's sentence, Judge Harmon stated:

Bonifacio Hernandez is before the Court for sentencing after entering a plea of "guilty" to one count of conspiracy to possess with intent to distribute 5 kilograms or more of a mixture and substance containing a detectable amount of cocaine, aiding and abetting, in a valid plea agreement.

The facts of the case reflected that Mr. Hernandez was accountable for the sale and negotiation of a total of 34.8 kilograms of cocaine from Deleon, Escobar and Garcia.  He did not occupy either an aggravating or a mitigating role in this drug conspiracy.  He's accepted responsibility for his participation in the instant offense and has expressed remorse for having engaged in illegal activity.

He has used various alias names and Social Security numbers and his employment record does not reflect employment stability.  His criminal history is extensive and includes prior convictions for importation of marijuana, and he has a state charge pending here in Harris County, Texas.

I believe that a sentence in the middle of the Guideline range takes into account Mr. Hernandez's conduct in the instant case and appropriately sanctions his activities. This sentence appears adequate in meeting the sentencing objectives of 18, United States Code, Section 3553(a) which instructs the Court to impose a sentence sufficient but not greater than necessary when considering the nature and circumstances of the offense and the history and characteristics of the defendant. I have considered the Guidelines and find that a sentence within those guidelines is consistent with and takes into account for purposes of 18, United States Code, Section 3553(a). (Transcript of Sentencing Hearing, Document No. 335, pp. 6-7).

Judgment was entered on March 6, 2007. (Document No. 251).   Hernandez appealed to the Fifth

Circuit Court of Appeals.  (Document No. 246).  The Fifth Circuit affirmed Hernandez's sentence

on February 7, 2008.  (Document Nos. 404, 405).  The Fifth Circuit wrote:

Bonifacio Hernandez appeals the sentences imposed following his guilty plea convictions for conspiracy to possess with intent to distribute five kilograms or more of cocaine in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(ii), 846 and 18 U.S.C. § 2.  He argues that the district court clearly erred in calculating the amount of drugs attributable to him as relevant conduct under United States Sentencing Guidelines § 1B1.3 and that the district court erred in failing to make the necessary finding of the scope of this agreement with his co-conspirators.  We review the district court's drug quantity calculation for clear error.  *United States v. Schorovsky*, 202 F.3d 727, 729 (5th Cir. 2000).

Hernandez claims that, in connection with the drug conspiracy, he was involved only with 9.9 kilograms of cocaine seized from a van occupied by this co-conspirators and that he had no knowledge of the 29.4 kilograms of cocaine that were seized by law enforcement officers from a residence at 8915 Alejo in Houston, Texas.  The facts admitted by Hernandez during his rearraignment and contained in the presentence report established, however, that Hernandez met with his co-conspirators at a restaurant to discuss a cocaine deal, that he was present at the Alejo residence when 34.8 kilograms of cocaine were packaged for distribution, and that he stayed in the residence after the 9.9 kilograms were taken from the residence by others in the van. Hernandez's assertion that he was involved only with the 9.9 kilograms in the van is belied by the fact that he was not in the van when it was stopped and the fact that he stayed behind at the Alejo residence with a much larger amount of cocaine.

Given the undisputed facts before the district court, it was plausible from the record as a whole for the district court to find that Hernandez should be held accountable for the 24.9 kilograms of cocaine found in the Alejo residence.  *See* § 1B1.3(a)(1), comment. (n.2); *Burton v. United States*, 237 F.3d 490, 500 (5th Cir. 2000); *United*

18

*States v. Duncan*, 191 F.3d 569, 577 (5th Cir. 1999). As it was not clearly erroneous for the district court to conclude that the cocaine found in the Alejo residence was within the scope of the jointly undertaken criminal activity by Hernandez and his co-conspirators, his sentences are AFFIRMED. (Document No. 404).

On February 3, 2009, within one year of his conviction being final, Hernandez timely filed a § 2255 Motion to Vacate, Set Aside, or Correct Sentence (Document No. 427). In his § 2255 motion, Hernandez raises claims of ineffective assistance of counsel. According to Hernandez, his counsel rendered ineffective assistance when he failed to challenge the enhancement to his sentence. According to Hernandez, he should only have been accountable for 9.9 kilograms of cocaine. He further claims that counsel was ineffective when he induced him to plead guilty by threats and intimidations by promising him a "120 month or less sentence" or a "121 month" sentence. Hernandez further alleges that counsel was ineffective because he failed to object based on the Government's breach of the plea agreement. Hernandez, in his response to the Government's Motion to Dismiss, further contends that his guilty plea was not knowing and voluntary because he did not understand the elements of the offense with which he was charged, he did not understand the consequences of his plea and his plea was based on an affirmative misrepresentation of counsel. (Document No. 439, p. 3 & 6).

The Government, in its Motion to Dismiss (Document No. 436) argues that Hernandez's § 2255 Motion to Vacate, Set Aside or Correct Sentence should be dismissed because Hernandez is not entitled to relief. According to the Government, Hernandez has not shown that his counsel was deficient nor has he shown that he was prejudiced.

19

With respect to Hernandez's allegations of ineffective assistance of counsel, the Government has submitted the affidavit of Hernandez's counsel, David Adler, which has been included the record (Document No. 447).  Mr. Adler states in pertinent part as follows:

> 2.  I am an attorney licensed by the Supreme Court of Texas.  I obtained my license on May 4, 1990.  I primarily represent defendants charged in criminal matters pending in federal courts.

> 3.  I was appointed to represent Bonifacio Hernandez in cause H-CR-06-089-01 before the Honorable Melinda Harmon in the United States District Court for the Southern District of Texas.

> 4.  I have reviewed the motion to vacate sentence pursuant to 28 U.S.C. § 2255 filed by Mr. Hernandez.

> 5.  Mr. Hernandez's claims include an allegation that I rendered ineffective assistance of counsel in violation of his Sixth Amendment rights.  Mr. Hernandez claims I induced him to plead guilty, and that he should not have been sentenced based upon 34.8 kilograms of cocaine.

> 6.  I did not induce Mr. Hernandez to plead guilty.  I did not threaten or intimidate Mr. Hernandez at any time during the course of my representation.

> 7.  I did not promise Mr. Hernandez that he was going to receive "120 months or less" as he claims on pages 2, 5, and 6 of his motion, or a sentence of 121 months as he stated on page 4 of his motion.  I did not tell Mr. Hernandez that he would receive a sentence of any specific amount of time.

> 8.  I explained to Mr. Hernandez - on several occasions– how sentencing procedure in federal court worked.  I discussed with him the different factors that the court would review before determining his sentence, including the concept of relevant conduct.  I repeatedly advised Mr. Hernandez that the court might base his sentence of an amount of drugs that was larger than the amount of drugs with which he was directly involved.  I provided Mr. Hernandez estimates of what I believed his sentence would be based upon the different possible scenarios the court might use.

> 9.  Mr. Hernandez claims on page 6 of his motion that I failed to object to the government's violation of the plea agreement.  He also references a plea agreement on page 4 of his motion.  No plea agreement was reached in Mr. Hernandez's case. No plea agreement was filed in Mr. Hernandez's case.

10.  Prior to sentencing, I filed written objections to the presentence investigation report (PSR).  This pleading included an objection to the PSR's determination that Mr. Hernandez should be held accountable for 34.8 kilograms of cocaine.  The court denied this objection during the sentencing hearing.  (Document No. 447).

Hernandez was provided a copy of counsel's affidavit, which was attached to the Government's Motion to Dismiss.  The docket sheet shows that Hernandez responded to the Government's motion and to the contents of the affidavit.  (Document No. 439).

Claims of ineffective assistance of counsel are generally measured by the standard of *Strickland v. Washington*, 466 U.S. 668 (1984).  Under *Strickland*, a petitioner must be able to show that his counsel was deficient and that the deficiency prejudiced him to the extent that a fair trial could not be had.  *Strickland*, 466 U.S. at 687.  Deficiency is judged by an objective reasonableness standard, with great deference given to counsel and a presumption that the disputed conduct is reasonable.  *Id.* at 687-88.  The prejudice element requires a petitioner to prove that absent the disputed conduct of counsel, the outcome would have been both different and more favorable.  *Id.* at 694-95.  Under *Strickland*, a petitioner must establish both deficiency and prejudice prongs to be entitled to habeas relief.  The failure to establish either deficient performance or prejudice makes it unnecessary to examine the other prong.  *United States v. Seyfert,* 67 F.3d 544, 547 (5th Cir. 1995).

Under the deficiency prong of *Strickland*, judicial scrutiny of counsel's performance is "highly deferential" and "a strong presumption" is made that "trial counsel rendered adequate assistance and that the challenged conduct was the product of reasoned trial strategy."  *Wilkerson v. Collins*, 950 F.2d 1054, 1064-65 (5th Cir. 1992), *cert. denied,* 509 U.S. 921 (1993) (citing *Strickland*).  To overcome the presumption of competence, the petitioner "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment."  *Strickland*,

21

466 U.S. at 690.  Under the prejudice prong of *Strickland,* a petitioner must be able to establish that absent his counsel's deficient performance, the result of his trial could have been different.  "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691.

Constitutionally effective assistance of counsel under *Strickland* is not errorless counsel.  The determination of whether counsel has rendered reasonably effective assistance turns on the totality of facts in the entire record.  Each case is judged in light of the number, nature, and seriousness of the charges against a defendant, the strength of the case against him, and the strength and complexity of his possible defense. *Baldwin v. Maggio*, 704 F.2d 1325, 1329 (5th Cir. 1983), *cert. denied,* 467 U.S. 1220 (1984).  The reasonableness of the challenged conduct is determined by viewing the circumstances at the time of that conduct.  *Strickland,* 466 U.S. at 690.  "We will not find inadequate representation merely because, with the benefit of hindsight, we disagree with counsel's strategic choices." *Kitchens v. Johnson*, 190 F.3d 698, 701 (5th Cir. 1999) (quoting *Green v. Johnson*, 116 F.3d 1115, 1122 (5th Cir. 1997)).  Conclusory allegations of ineffective assistance of counsel do not raise a constitutional question in a federal habeas petition. *Miller v. Johnson,* 200 F.3d 274, 281 (5th Cir. 2000), *cert. denied*, 531 U.S. 849 (2000) (citing *Barnard v. Collins,* 958 F.2d 634, 642 (5th Cir. 1992); *Ross v. Estelle*, 694 F.2d 1008, 1012 (5th Cir. 1983)).

With respect to guilty pleas, the prejudice requirement "focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985).  Thus, Hernandez "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Id.*  As to the specific examples of ineffective assistance of counsel which Hernandez cites to in

22

support of his ineffectiveness claims, such as that counsel should have objected to his sentence enhancement and should have argued that he should have only been accountable for 9.9 kilograms of cocaine, that counsel promised him a particular sentence, that he should have argued the Government breached the plea agreement, and that his plea was not knowing and voluntary because he did not understand the elements of the offense with which he was charged, did not understand the consequences of this plea, and was based on counsel's misrepresentations, the record either affirmatively shows that Hernandez's counsel was not deficient or there is no evidence that the alleged errors prejudiced Hernandez within the meaning of *Strickland*.

Here, the record clearly shows that counsel made all the objections that Hernandez claims he failed to make in his written objections to the PSR, and the same objections were argued at the Sentencing Hearing. (Document No. 214, Transcript of Sentencing Hearing, Document No. 335, pp. 4-5). With respect to Hernandez's allegation that counsel should have objected to the Government's breach of the Plea Agreement, the docket sheet shows that there was no written Plea Agreement. As such, counsel cannot be found ineffective for failing to object when there was no basis to make the objection.   As to Hernandez's allegations that counsel promised him a sentence of 120 months or 121 months, again, other than Hernandez's conclusory allegations, he has pointed to nothing in the record to support his claims.   Indeed, the transcript of his Rearraignment makes clear that Hernandez had not been promised a particular sentence, such as 120 months or 121 months.   Rather, Judge Harmon made clear that she was not in a position at that time to advise Hernandez of his sentence and would not be until after preparation of the PSR.   Moreover, Hernandez has not come forward with affidavits from reliable third parties establishing the terms of the alleged promise of a 120 month or less sentence or 121 month sentence, the time and place of the promise, or the identity

23

of any eyewitnesses to the promise.  *See United States v. Cervantes*, 132 F.3d 1106, 1110 (5th Cir. 1998).  Hernandez's own self-serving conclusional allegations are not sufficient.  *Id.; see also United States v. Demik*, 489 F.3d 644, 646-47 (5th Cir.), *cert. denied*, 128 S.Ct. 456 (2007).  Likewise, to the extent that Hernandez contends that he was not aware of the elements of the offense with which he was charged and did not understand the consequences of his guilty plea, again the record refutes his claim.  Judge Harmon advised Hernandez of the elements of the offense with which he was charged and the factual basis of the plea as well the consequences of his guilty plea.   Because Hernandez's allegations are contrary to his own testimony at the Rearraignment, which is presumptively truthful, he has offered no proof as to how his counsel's performance was objectively deficient, or proof that such deficient performance prejudiced him in any way.  *See Strickland*, 466 U.S. at 687.  Therefore, no relief is available under § 2255 on the ineffective assistance of counsel claims.

**V.  Conclusion and Recommendation**

Based on the foregoing, it is

RECOMMENDED that the Government's Motion to Dismiss (Document No. 435) be GRANTED, and that Movant Bonifasio Hernandez's § 2255 Motion to Vacate, Set Aside or Correct Sentence (Document No. 427) be DENIED.  It is FURTHER

ORDERED that Movant Bonifasio Hernandez's Motion for an Evidentiary Hearing (Document No. 440) is DENIED.

The Clerk shall file this instrument and provide a copy to all counsel and unrepresented parties of record.  Within 10 days after being served with a copy, any party may file written objections pursuant to 28 U.S.C. § 636(b)(1)(C), Fed.R.Civ.P. 72(b), and General Order 80-5, S.D. Texas.

24

Failure to file objections within such period shall bar an aggrieved party from attacking factual findings on appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Ware v. King*, 694 F.2d 89 (5th Cir. 1982), *cert. denied*, 461 U.S. 930 (1983); *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982) (en banc). Moreover, absent plain error, failure to file objections within the ten day period bars an aggrieved party from attacking conclusions of law on appeal. *Douglass v. United Services Automobile Association*, 79 F.3d 1415, 1429 (5th Cir. 1996). The original of any written objections shall be filed with the United States District Clerk, P.O. Box 61010, Houston, Texas 77208.

Signed at Houston, Texas, this 1st day of September, 2009.

Frances H. Stacy
United States Magistrate Judge

25